## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**CATAPULT TECHNOLOGY, LTD.**
**A Maryland Corporation**
    7500 Old Georgetown Road, 11th Floor
    Bethesda, Montgomery Co., MD 20814

        *Plaintiff*,

**v.**

        Case no: 8:14-cv-66

**INTELLIGENT DECISIONS, INC.**
**A Virginia Corporation**
    Serve:
        Harry I. Martin, Jr.
        21445 Beaumeade Circle,
        Ashburn, VA 20147.

        *Defendant*.

## COMPLAINT

Catapult Technology, Ltd. ("Catapult") submits this Complaint of the dispute described below with Intelligent Decisions, Inc. ("IDI") pursuant to the March 11, 2008 Subcontract Agreement 2008-10154-S-0003 ("Subcontract").

## SUMMARY OF DISPUTE

1.    This dispute arises out of IDI's breach of the non-compete, non-solicitation, and confidentiality obligations contained in its Subcontract with Catapult, and IDI's misappropriation of Catapult's trade secrets. Catapult's relationship with IDI began in 2008, when Catapult selected IDI to be one of its subcontractors on the U.S. General Services Administration ("GSA") Infrastructure Technology Global Operations ("GITGO") contract. At that time, IDI agreed that during the term of the Subcontract, and for one year after, IDI would not solicit Catapult's customer, GSA, either directly or through another contractor. IDI further agreed that

it would not use or disclose Catapult's confidential and proprietary information except to further the objectives of the Subcontract.

2.      In flagrant defiance of IDI's non-compete and confidentiality commitments under the Subcontract, IDI joined with Catapult's competitor, AAC, Inc. ("AAC") to compete against Catapult, and used Catapult's trade secrets and other confidential and proprietary information to assist AAC in preparing its competitive proposal.  When the GITGO contract was set to expire, GSA issued a task order request ("Solicitation") for the follow-on task order ("GTO Task Order") for the continuation of GITGO work.  While working for Catapult under the incumbent contract and being exposed to Catapult confidential information and trade secret based on the assurances of confidentiality and non-competition in the Subcontract, IDI and AAC teamed together to compete against Catapult for the follow-on GTO Task Order and used Catapult's confidential, proprietary and trade secret information to prepare AAC's competitive proposal for the GTO Task Order.

3.      IDI and AAC, relying on Catapult's confidential and proprietary strategic plans, customer lists, pricing, and other competitively sensitive information, submitted a proposal for the GTO Task Order, which, based on the information received at the debriefing, appears to have proposed an approach that was quite similar to, and a price that was marginally below, the proposal made by Catapult and its strategic partner, Digital Management, Inc. ("DMI").

4.      IDI thus solicited GSA, the very customer it expressly agreed not to solicit, for work that was substantially similar to the work performed for Catapult under the GITGO contract, all while using and disclosing Catapult's confidential and proprietary information and misappropriating Catapult's trade secrets.  Under settled law, IDI is liable to Catapult for substantial damages and should be required to account for each illicit disclosure and ensure the return of all of Catapult's confidential and proprietary information.

5.      As a result of these actions, IDI has breached the Subcontract with Catapult and misappropriated Catapult's trade secrets.   Catapult seeks: (1) an award of Catapult's direct damages, including but not limited to lost profits and/or unjust enrichment, for IDI's breach of confidentiality, non-compete, and non-solicitation agreements; (2) an award of Catapult's damages for IDI's misappropriation of Catapult's trade secrets, including but not limited to lost profits, unjust enrichment, and punitive damages; and (3) an accounting of all individuals/companies in receipt of Catapult's confidential and proprietary information, and an order requiring return of all such information.

## PARTIES AND JURISDICTION

6.      Plaintiff Catapult is a leading federal contractor providing information technology and management consulting services to the federal government.   Catapult is a Maryland corporation.  Catapult's principal executive offices are located at 7500 Old Georgetown Road, 11th Floor, Bethesda, MD 20814.

7.      Defendant Intelligent Decisions, Inc. provides services related to computer network defense, information assurance, data encryption and authentication to the federal government.  IDI is a Virginia corporation.   On information and belief, IDI's principal executive offices are located at 21445 Beaumeade Circle, Ashburn, VA 20147.

8.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c).

## BACKGROUND

I.   **General Services Administration (GSA) Infrastructure Technology Global Operations (GITGO) contract**

10.     In 2005, the U.S. General Services Administration ("GSA") announced an internal reorganization consolidating the Federal Technology Service and Federal Supply Service into a single organization, the Federal Acquisition Service. Critical to centralizing IT systems, GSA's Infrastructure Technology Global Operations ("GITGO"), was designed to eliminate incompatible systems, improve reliability, and formalize a standard enterprise-wide resource management framework.

11.     In February of 2007, the GSA selected Catapult as the prime contractor for GITGO.   GSA awarded Catapult a five-year $200 million contract to implement GITGO. Catapult nearly doubled its revenue as a result of this award, which helped propel the company to the next level of service for its nationwide roster of clients.

II.   **Catapult's Subcontract with IDI**

12.     In January of 2008, Catapult and IDI (the "Parties") initiated discussions regarding an accelerated refresh of GSA workstations under the GITGO program.   IDI submitted a proposal and Catapult provided direct input and directed each of these revisions for the effort, and this information was incorporated into Catapult's proposal to GSA.

13.     Catapult issued IDI an Authorization to Proceed for services effective March 11, 2008.  Subsequently the Parties entered into the Subcontract agreement effective that same date. The Subcontract has been modified several times to exercise options and adjust the scope of services to include other projects.

14.     In March 2011, pursuant to that same Subcontract, Catapult further engaged IDI to perform an enterprise wide assessment of GSA's infrastructure in support of Catapult's

recommendation to GSA to move to a Virtual Desktop Infrastructure.  This initiative was designed to save significant cost and position GSA for further efficiencies and cost reductions.

15. Effective April 10, 2012, the Subcontract was further modified to continue IDI's performance under Catapult's prime Task Order GSI0012AA0025, which is the logical follow-on order to the original task order issued in 2007.

16. IDI's provision of services under the Subcontract with Catapult ceased on July 16, 2013.  However, that Subcontract, in particular, IDI's non-compete and non-disclosure obligations under that Subcontract, is still in force.

17. Under the Subcontract with Catapult, IDI performed services for GSA that included implementing and administering a CITRIX platform and conducting an enterprise assessment to develop a virtual desktop program that would allow GSA users to work from off-site locations.  IDI also provided technical support for GSA's office moves and the accelerated refresh of GSA workstations.

18. The Subcontract Section H.33 provides, in relevant part, that IDI may not solicit, accept business from, or perform work for GSA for the term of the Subcontract and for one year after termination or expiration:

> During the term of this Agreement and for a period of one (1) year after expiration or termination of this Agreement, ***Seller shall not directly or indirectly, or through the use of others, whether as principal, agent, employee, trustee or through the agency of any person or entity, canvass, solicit or accept business from or perform work for (collectively "solicit") the End Client, if the services or products to be provided to said End Client are similar to the services and products of Buyer which Seller provides under this Agreement*** . . . . (emphasis added)

19. Specifically, IDI is prohibited from working on behalf of a prime contractor that has won an award after competitive bidding against Catapult:

Examples of the activity prohibited by this paragraph include but are not limited to the following: (i) indirectly soliciting Potential Client business by becoming a consultant to a team member on a competitive bid team for work solicited by a Potential Client; (ii) *indirectly soliciting Potential Client business by working for or on behalf of a prime contractor, or on behalf of a subcontractor to a prime contractor, which has won award of a contract for following work after competitive bidding with Buyer* . . . . (emphasis added).

20.    IDI is furthermore prohibited from using Catapult's confidential information and trade secrets for any purpose other than furthering the objectives of the Subcontract, and under no circumstances did the Subcontract permit IDI to disclose such information to Catapult's competitors.  Section H.11(b) of the Subcontract states, in relevant part:

*Each party agrees that neither it, nor its employees or agents, shall employ the Confidential Information or Trade Secrets of the other party for any purpose other than in furtherance of the objectives of this Agreement, nor disclose, transfer, copy or allow access to any such Confidential Information or Trade Secret of the other party to any other person without the other party's prior written consent*, except that Catapult may disclose, transfer or copy such information in fulfillment of the rights in data clauses in the Prime Contract. *Without limiting the foregoing, in no event shall either party, or its employees or agents, disclose any such Confidential Information or Trade Secret to any competitors of the other party.* (emphasis added)

21.    And IDI is also prohibited under section H.11(c) from using the information it obtains during the course of the Subcontract to compete with Catapult for one year following the termination or expiration of the agreement:

The parties hereto agree that all information and data of whatsoever kind or nature furnished or made available from one party to the other shall be treated as confidential and shall not be disclosed to anyone, in any manner whatsoever, either in whole or in part, except upon written authorization by the disclosing party. Each party agrees that such information obtained during the course of this Subcontract Agreement *may not be utilized by the other party to compete directly or indirectly against the other party*, nor its other consultants, contractors, or Subcontractors for one (1)

year after the termination or expiration of this Agreement.
(emphasis added).

(Subcontract § H.11(c))  Thus it is a violation of the Subcontract for IDI to use the information it

obtained under the Subcontract to compete with Catapult.

### III.    Catapult's Confidential Information

22.    During the term of the Subcontract, IDI worked with and was exposed to highly

confidential and proprietary information of Catapult, including but not limited to pricing,

strategic initiatives, staffing plans, technical support designs, processes, procedures, organization

charts, customer contact information, and subcontractor information. Specifically, IDI had

information about the rates Catapult charged for its services.

23.    IDI's role in its performance under the GITGO contract exposed IDI to Catapult's

strategic planning as well as a proprietary roadmap that Catapult developed specifically for GSA.

24.    IDI has participated in all aspects of operational process during its work on the

GITGO contract.  IDI had direct exposure to Catapult proprietary standard operating procedures,

organization charts of both Catapult and GSA, the change management process, all customized

ITIL processes developed for GSA, project lists, statuses and priorities, strategic technical

initiatives, and the desktop image, which provides a significant advantage in proposing technical

solutions.

25.    IDI furthermore gained specific knowledge of all of GSA's key systems, such as

network architecture, workstation configuration, server infrastructure, and application

infrastructure. For example, in November, 2010 Catapult developed and recommended the

Virtual Desktop Initiative to GSA, GSA approved this initiative, and on January 18, 2011 issued

Catapult a Call for Services (a task order modification) to perform the strategic planning for this

initiative.  Catapult, in turn, sought the assistance of IDI to perform a portion of this strategic

planning effort.  Pursuant to the initiative, Catapult and IDI reviewed the entire GSA enterprise in order design and develop a recommended new infrastructure to support the virtual desktop solution.

26.     This comprehensive understanding of the GSA network and its detailed planning efforts for the next generation virtual desktop solution gave Catapult a natural and significant competitive advantage over its competitors in competing for the follow-on GTO Task Order. Likewise, if this confidential information were in the hands of a competitor, it could be used to favorably compete with Catapult and strategically under-bid Catapult on the price of the contract while offering essentially the same services.  Catapult therefore derived significant value not only from possessing this confidential information, but also from keeping the information secret from its competitors.

27.     This information described in paragraphs 22 through 26 is kept confidential and proprietary.  It is not available to the public, and is not disseminated to anyone other than select employees of Catapult and its subcontractors, subject to terms of non-disclosure provisions of those Subcontracts.   This information constitutes proprietary trade secret information of Catapult.

28.     Catapult keeps its confidential and proprietary information secret by, among other security procedures, having employees and its subcontractors sign confidentiality and non-compete agreements and disseminating and enforcing policies regarding the handling and treatment of confidential information.  Catapult also implements other measures to protect its confidential and proprietary information, including use of pass keys, locked credenzas and offices, application of permissions to data stores of confidential information, and encryption of confidential information.  Information is shared throughout the team on a need-to-know basis.

**IV.**    **IDI's Illicit Partnership with Catapult's Competitor to Bid for GSA Contract**

29.    On February 23, 2012, the GSA issued Task Order Request No. GSA-IO-12-0797. That Task Order Request was for the follow-on order to the current GITGO task order ("GTO Task Order") that was awarded to Catapult in 2007.

30.    Catapult teamed with its strategic partner, DMI, to bid for the continuation of the GITGO Contract.

31.    On information and belief, at some point during the term of the Subcontract, IDI formed a partnership with AAC to submit their own bid for the GTO Task Order in violation of sections H.11 and H.33 of the Subcontract.  AAC had no background with the GITGO contract or the GSA infrastructure and therefore could likely not realistically compete for the requirement without the knowledge and support of IDI.

32.    Catapult, along with its partner DMI, submitted a proposal for the GTO Task Order in two (2) parts.  Part 1 was submitted on March 19, 2012, and Part 2 was submitted on June 11, 2012.  IDI and AAC also submitted a proposal for the GTO Task Order.

33.    On February 22, 2013, GSA notified DMI that the GTO Task Order was awarded to AAC.  DMI notified Catapult of the award that same day.  On February 28, 2013, DMI and Catapult were informed that (1) AAC had teamed with IDI and (2) AAC's proposed Best Case Scenario price was $190,451,354.00 and its Worst Case Scenario price was $215,405,726.00.

34.    On information and belief, IDI used Catapult's confidential pricing, strategic planning information, and other confidential and trade secret information that it learned in the course of its work under the Subcontract to assist AAC in preparing its proposal.

35.    On information and belief, IDI also learned confidential information about for the current and the Catapult-planned next generation GITGO infrastructure during its performance

of the Subcontract and used that confidential information to compete with, and/or assist AAC to compete with, Catapult.

36.     For example, pursuant to its work under the Subcontract, IDI had access to Catapult's GITGO contact list, which was used for intra-team collaboration and operational contacts.  IDI would have access to the entire staff directory, including the list of Catapult's employees with home numbers for Continuity of Operations and disaster recovery.

37.     On information and belief, IDI disclosed Catapult's confidential information and trade secrets to AAC or others not in furtherance of the objectives of the Subcontract.

**V.     IDI's Actual and Threatened Misappropriation of Catapult's Trade Secrets**

38.     During the period that IDI has been subject to the requirements and limitations of the Subcontract, and without Catapult's permission, IDI used Catapult's confidential information and trade secrets to directly compete against Catapult, and/or disclosed Catapult's confidential information and trade secrets to AAC to assist in preparing its proposal for the GTO Task Order competition.

39.     On information and belief, now that IDI and AAC have been awarded the contract for the GTO Task Order, IDI will continue to use and disclose Catapult's confidential information and trade secrets in furtherance of its performance of the contract, and will continue to do so throughout the term of the contract.

**VI.     Negotiations Pursuant to Section H.13 of the Subcontract**

40.     Catapult and IDI had an in-person meeting on April 11, 2013 to discuss the issues that are the subject of this Complaint, with the aim of resolving the present dispute.  Each party was represented by an executive who was authorized to negotiate and enter into an agreement on behalf of its respective organization.  This negotiation constituted a meeting, pursuant to Section

H.13 of the Subcontract to attempt to negotiate a resolution of the dispute that is the subject of this Complaint.

41.     Catapult and IDI then participated in a mediation on September 3, 2013 facilitated by Hon. Richard Levie (Ret.), with the aim of resolving the present dispute.  Each party was represented by an executive who was authorized to negotiate and enter into an agreement on behalf of its respective organization.  This negotiation constituted alternative dispute resolution pursuant to Section H.13 of the Subcontract.[1]

42.     Accordingly, the dispute is subject to resolution through litigation.

## CLAIMS

### Count I

### (Breach of Contract— Non-Solicitation/Non-Compete)

43.     Catapult incorporates by reference the Paragraphs 1-42 above as if set forth fully below.

44.     The Subcontract is a valid and enforceable contract between Catapult and IDI. Catapult has at all times performed its obligations under the Subcontract and Catapult was at all relevant times ready, willing, and able to perform its prospective obligations under the Subcontract.

45.     The Subcontract obligates IDI to refrain from soliciting, accepting business from, or performing work for GSA, either directly or indirectly, for the term of the Subcontract and for

---

[1] "This [Order] is simply saying first, we're going to sit down as big boys and girls and try to work this out ourselves. And if we can't, we agree to go to some process, typically mediation or settlement person, whatever the names they want to use, but somebody who can close the doors, fill it up with smoke in the room and get a deal done. **If that doesn't work, then the doors of the courthouse are wide open to come back here or to my friends in the Circuit Court for Montgomery County and litigate this case there.**" Transcript of Preliminary Injunction Hearing, Case No. RWT-13-1754, p.35:9-18 (July 24, 2013) (emphasis added).

one year after termination or expiration of the Subcontract if the services or products to be provided to GSA are similar to the services and products provided under the GITGO task order.

46.     On February 22, 2013, Catapult was informed that AAC had been awarded the contract for the GTO Task Order.  At the February 28, 2013 debriefing, Catapult and DMI were informed that IDI had teamed with AAC, Catapult's competitor, for GTO Task Order in blatant disregard of IDI's contractual obligations under the Subcontract with Catapult.

47.     Catapult has been harmed and will continue to be harmed by IDI's direct and/or indirect competition with Catapult for the GTO Task Order.

48.     Catapult is entitled to recover all damages resulting from IDI's breach of the non-compete and non-solicitation provisions of the Subcontract, including but not limited to lost profits and/or unjust enrichment.

## Count II

### (Breach of Contract— Disclosure/Misuse of Confidential Information)

49.      Catapult incorporates by reference the Paragraphs 1-48 above as if set forth fully below.

50.     The Subcontract is a valid and enforceable contract between Catapult and IDI. Catapult has at all times performed its obligations under the Subcontract and Catapult was at all relevant times ready, willing, and able to perform its prospective obligations under the Subcontract.

51.     The Subcontract prohibits IDI from using Catapult's confidential information and trade secrets for any purpose other than furthering the objectives of the Subcontract, and under no circumstances may IDI disclose such information to Catapult's competitors.

52.     The Subcontract also prohibits IDI from using information it obtained during the performance of the Subcontract to compete, either directly or indirectly, against Catapult.

53.     On information and belief, IDI used Catapult's confidential and proprietary information and other information obtained during the performance of the Subcontract to prepare and/or help AAC prepare its proposal for the GTO Task Order.  This information includes, but is not limited to, strategic pricing information, Catapult employee and customer contact lists, and Catapult's GSA-specific strategic planning information.  IDI used this information to assist AAC in crafting its technical solution and to strategically under-bid DMI's and Catapult's proposed price for the GTO Task Order, while offering services substantially similar to that proposed by Catapult.

54.     Catapult has been harmed and will continue to be harmed by IDI's misuse and disclosure of Catapult's confidential and trade secret information.

55.     Catapult is entitled to recover all damages resulting from IDI's breach of the confidentiality provisions of the Subcontract, including but not limited to lost profits and/or unjust enrichment.

## Count III

### (Misappropriation of Trade Secrets)

56.     Catapult incorporates by reference the Paragraphs 1-55 above as if set forth fully below.

57.     Pursuant to the Subcontract and by virtue of the subcontractor relationship with IDI, Catapult provided IDI with, and IDI was exposed to, valuable technical and strategic information that is confidential and proprietary to Catapult, including but not limited to Catapult's strategic planning information, strategic pricing and Catapult's employee and customer lists.

58.     For example, IDI worked with Catapult to prepare and present the findings under the Virtual Desktop Initiative ("VDI") assessment to Casey Coleman, CIO of GSA in order to

further GSA's understanding of the technology and how it would benefit GSA's IT infrastructure, and to gain acceptance and to commence production build of the VDI technology. This key strategic technology will serve as the basis for GSA's user computing strategy for the next 5 to 10 years, positioning Catapult to have a unique advantage in the follow-on GTO Task Order competition.

59.     Catapult has taken more than reasonable measures under the circumstances to maintain the secrecy of its trade secrets, including by having IDI and other subcontractors sign agreements prohibiting the use and disclosure of such information outside of Catapult, by having policies and procedures designed for the same purpose, and by engaging in physical security procedures.

60.     Through its subcontractor agreements and other security measures, Catapult sought to protect all valuable technical and strategic information that is confidential and proprietary to Catapult as trade secret.

61.     The strategic and technical information at issue in this case is valuable information kept confidential and proprietary to Catapult, and derives its economic value from not being generally known and readily ascertainable by competitors to Catapult and the public. Thus Catapult's strategic and technical information gives it a competitive advantage over its competitors and constitutes trade secrets under statutory law.

62.     IDI's wrongful disclosure and use of this confidential information for its own gain at the expense of Catapult also constitutes misappropriation of trade secrets under the Maryland Uniform Trade Secrets Act.  Md. Com. Law Code Ann. § 11-1201, *et seq*.

63.     As a direct and proximate result of the wrongful actions of Respondent IDI, IDI has been, and will continue to be, unjustly enriched by virtue of, among other things, GSA's award of the GTO Task Order to AAC and IDI.

64.     Catapult has suffered, and will continue to suffer, irreparable harm, including but not limited to its loss of investment in these trade secrets, possible public disclosure of its valuable trade secrets, and lost profits and/or unjust enrichment.

65.     IDI's misappropriation has been willful and malicious, thus entitling Catapult to its actual damages, punitive damages, injunctive relief and attorneys' fees.

## **PRAYER FOR RELIEF**

Catapult respectfully requests that the Court:

(a)     award to Catapult its direct damages, including but not limited to lost profits and/or unjust enrichment from the GTO Task Order, for its breach of the non-competition, non-solicitation, and confidentiality provisions of the Subcontract in an amount to be determined at a hearing;

(b)     award to Catapult its direct damages, including but not limited to lost profits and/or unjust enrichment, for IDI's misappropriation of trade secrets;

(c)     award punitive damages to Catapult for IDI's intentional misappropriation of Catapult's trade secrets;

(d)     order IDI to provide an accounting of all individuals/companies in receipt of the information;

(e)     order IDI to cease using Catapult's confidential information and trade secrets;

(f)     order IDI to return all confidential information;

(g)     award Catapult such other and further relief as the Court deems just and proper.

Respectfully submitted,

_____/s/_____

John E. McCarthy Jr. (#11397)
jmccarthy@crowell.com
Mark A. Klapow (*pro hac vice to be filed*)
mklapow@crowell.com
Jessica M. Thompson (#29668)
jmthompson@crowell.com
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500
(202) 628-5116 (fax)

*Counsel for Catapult Technology, Ltd.*